## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL A. PANDOLFO,** | : | **CIVIL ACTION NO. 3:13-CV-01713** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **vs.** | : | |
| | : | |
| **CAROLYN W. COLVIN, ACTING** | : | |
| **COMMISSIONER OF SOCIAL** | : | |
| **SECURITY,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

## Background

The above-captioned action seeks review of a decision of the Commissioner

of Social Security ("Commissioner") denying Plaintiff Michael A. Pandolfo's claim

for social security disability insurance benefits and supplemental security income

benefits.  Under 42 U.S.C. § 405(g) and relevant case law, the court is generally

limited to reviewing the administrative record to determine whether the decision is

supported by substantial evidence.

Disability insurance benefits are paid to an individual if that individual is

disabled and "insured," that is, the individual has worked long enough and paid

social security taxes.  The last date that a claimant meets the requirements of being

insured is commonly referred to as the "date last insured."  It is undisputed that

Pandolfo meets the insured status requirements of the Social Security Act through

December 31, 2015.  Tr. 22 and 24.[1]

Supplemental security income is a federal income supplement program

funded by general tax revenues (not social security taxes).  It is designed to help

aged, blind or other disabled individuals who have little or no income.  Insured

status is irrelevant in determining a claimant's eligibility for supplemental security

income benefits.

On October 4, 2010, Pandolfo protectively filed[2] an application for disability

insurance benefits and an application for supplemental security income benefits.

Tr. 22, 104-103,  165-171, and 315.  On February 11, 2011, the Bureau of Disability

Determination[3] denied Pandolfo's applications. Tr. 22, 48, 79-102 and 107-129.  On

March 10, 2011, Pandolfo filed a request for a hearing before an administrative law

judge. Tr. 22 and 131-132.  The request was granted and a hearing was held on

January 19, 2012. Tr. 22 and 45-78.  Pandolfo was represented by counsel at the

hearing. Id.

---

[1]References to "Tr._" are to pages of the administrative record filed by the
Defendant as part of the Answer on September 9, 2013.

[2]A protective filing occurs when an individual initially contacts the Social
Security Administration to file a claim for benefits and requests an expedited filing
date. Simply stated, it allows an individual to have an application date based upon
the date of his or her first contact with the Administration.

[3]The Bureau of Disability Determination is an agency of the state which
initially evaluates applications for disability insurance benefits and supplemental
security income benefits on behalf of the Social Security Administration.  Tr. 108
and 120.

Pandolfo in his applications for disability insurance benefits and supplemental security income benefits alleged that he became disabled on July 31, 2010. Tr.  22, 165 and 293.  In documents filed with the Social Security Administration and at the administrative hearing, Pandolfo claimed that he was disabled because of both physical and mental impairments, including depression, spinal stenosis, bulging discs and osteoarthritis. Tr. 54, 296 and  317.   Pandolfo claims that he has difficulty sitting, standing and walking, and concentrating and focusing,  for long periods of time. Tr. 317.

On June 25, 2012, the administrative law judge issued a decision denying Pandolfo's applications. Tr. 22-40.  The administrative law judge found that Pandolfo failed to prove that he met the requirements of a listed impairment or suffered from work-preclusive functional limitations. Id.  The administrative law judge concluded that Pandolfo had the ability to engage in a limited range of unskilled work "at all exertional levels."[4] Tr. 28.

---

[4]The terms sedentary, light, medium, heavy and very heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work.*  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in

On July 13, 2012, Pandolfo filed a request for review with the Appeals Council. Tr. 18 and 349-351. On April 25, 2013, the Appeals Council concluded that there was no basis upon which to grant Pandolfo's request for review. Tr. 1-7. Pandolfo filed the instant complaint in this court on June 24, 2013.

---

this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work*. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work*. Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

(e) *Very heavy work*. Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work.

2 C.F.R. §§ 404.1567 and 416.967.

Pandolfo, who was born in the United States on July 29, 1953,[5] graduated from high school in 1971, and can read, write, and converse in English and perform basic mathematical functions. Tr. 82, 295, 297 and 307.   During his elementary and secondary schooling, Pandolfo attended regular education classes. Tr. 297. After graduating from high school Pandolfo did not complete "any type of specialized job training, trade or vocational school." Id.

Pandolfo's work history covers 44 years and at least 3 different employers. Tr. 176-184, 324 and 340.  The records of the Social Security Administration reveal that Pandolfo had earnings in the years 1967 through 2010. Tr. 184.  Pandolfo's annual earnings range from a low of $268.03 in 1967 to a high of $63,235.88 in 1998. Id.  The sum of Pandolfo's earnings during those 44 years is $913,600.99. Id.  Pandolfo reported that he worked as (1) a hotel manager from January, 1999, to July 31, 2010; (2) a road foreman for the Pennsylvania Turnpike Commission from December, 1973 to April, 1999; and (3) as a home repairman from January, 1996, to December, 1999. Tr. 324 and 340.   Pandolfo reported that he quit working  on July 31, 2010, because of his condition. Tr. 296.  In a letter dated May 16, 2012, Pandolfo stated

---

[5] At the time Pandolfo filed his applications for disability insurance benefits and supplemental security income benefits on October 4, 2010, he was 57 years of age.  Under the Social Security regulations a person 55 or older is considered a person of advanced age.  20 C.F.R. § 404.1563(e).  The Social Security Administration considers such age to significantly affect a persons ability to adjust to other work and special rules are applied. Id.  Specifically, a person of advanced age who is limited to unskilled, light work without any transferable job skill and who cannot perform his or her past relevant employment is considered disabled. 20 C.F.R. §404.1568(d)(4).

that prior to July 31, 2010, he was a cook/kitchen manager at a hotel and that after

that date he was "just an owner/investor."[6] Tr. 343.

A vocational expert identified Pandolfo's past relevant employment[7] as (1) a

hotel manager which the vocational expert described as skilled, medium work as

generally performed in the economy and very heavy work as actually performed by

Pandolfo; (2) a home repairer described as skilled, medium work as generally

performed and skilled, very heavy work as actually performed; and (3) a

maintenance foreman described as skilled, heavy work as generally performed but

very heavy work as actually performed . Tr. 70.

## I.   Standard of Review

When considering a social security appeal, we have plenary review of all legal

issues decided by the Commissioner.  See Poulos v. Commissioner of Social

Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec.

---

[6]After the administrative law judge issued his decision, a letter dated September 1, 2010, was submitted to the Appeals Council by a certified public accountant indicating that Pandolfo was "no longer employed by the Hotel Jonas, Inc., and is not involved in any capacity in the operation or management of the Hotel, nor does he receive any financial benefit from the Hotel." Tr. 348.  Pandolfo also submitted additional medical records to the Appeals Council but specifically notes that he is not relying on them in the present appeal. Doc. 9, Plaintiff's Appeal Brief, p. 3, n. 2.

[7]Past relevant employment in the present case means work performed by Pandolfo during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565. To be considered past relevant work, the work must also amount to substantial gainful activity. Pursuant to Federal Regulations a person's earnings have to rise to a certain level to be considered substantial gainful activity.

Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858

(3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant

to 42 U.S.C. § 405(g) is to determine whether those findings are supported by

"substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988);

Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are

supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v.

Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are

supported by substantial evidence, we are bound by those findings, even if we

would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700,

704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive

by a reviewing court if supported by substantial evidence.").

Substantial evidence "does not mean a large or considerable amount of

evidence, but 'rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565

(1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938));

Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);

Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been

described as more than a mere scintilla of evidence but less than a preponderance.

Brown, 845 F.2d at 1213. In an adequately developed factual record substantial

evidence may be "something less than the weight of the evidence, and the

possibility of drawing two inconsistent conclusions from the evidence does not

prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## II.   **Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether

such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  See 20 C.F.R. §§ 404.1520 and 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[8] (2) has an impairment that is severe or a combination of impairments that

---

[8]If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. §§ 404.1510 and 416.910.

is severe,[9] (3) has an impairment or combination of impairments that meets or

equals the requirements of a listed impairment,[10] (4) has the residual functional

capacity to return to his or her past work and (5) if not, whether he or she can

perform other work in the national economy. Id.  As part of step four the

administrative law judge must determine the claimant's residual functional

capacity. Id.[11]

Residual functional capacity is the individual's maximum remaining ability to

do sustained work activities in an ordinary work setting on a regular and

_____

[9]The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).  An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant's performance of basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. §§ 404.1545(b) and 416.945(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. §§ 404.1545(c) and 416.945(c).

[10]If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

[11]If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

continuing basis. <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. <u>Id</u>; 20 C.F.R. §§ 404.1545 and 416.945; <u>Hartranft</u>, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

### III. <u>Medical Records</u>

Before we address the administrative law judge's decision and the arguments of counsel, we will review Pandolfo's pertinent medical records and we will commence with records from early, 2010, which predate Pandolfo's alleged disability onset date of July 31, 2010.

On March 15, 2010, Ana Velez, a Master's degree level and licensed social worker, commenced counseling Pandolfo for "severe depression and anxiety caused by his business and personal conflicts in his life." Tr. 419. At that initial therapy session Pandolfo was moderately depressed with suicidal ideation. <u>Id.</u> Over the next six months Pandolfo had 12 sessions with Ms. Velez. Tr. 419-421. The notes of those sessions reveal that the impetus for some of Pandolfo's depression was the difficulties he was experiencing with a business partner. <u>Id.</u> At the last therapy session on September 7, 2010, Ms. Velez noted that Pandolfo was "severely depressed with suicidal ideation." Tr. 420. Her diagnostic assessment was that Pandolfo suffered from depression, anxiety with different moods and suicidal

ideation and she gave Pandolfo a Global Assessment of Functioning (GAF) score of

55.[12] Tr. 421.

On June 23, 2010, Pandolfo underwent a series of x-rays (anterior/posterior,

lateral and obliques) of the lumbar spine at the request of his family physician,

Edward Manzella, M.D., whose practice is located in Jim Thorpe, Pennsylvania. Tr.

524.  The x-rays revealed mild degenerative changes in the lower lumbar spine and

no compression fractures. Id.

On August 1, 2010, Pandolfo was transported by ambulance and admitted to

the Pocono Medical Center located in East Stroudsburg, Pennsylvania, after a

---

[12]The GAF score allows a clinician to indicate his judgment of a person's
overall psychological, social and occupational functioning, in order to assess the
person's mental health illness.  *Diagnostic and Statistical Manual of Mental
Disorders* 3–32 (4th ed. 1994). A GAF score is set within a particular range if either
the symptom severity or the level of functioning falls within that range. Id. The
score is useful in planning treatment and predicting outcomes. Id.  The GAF rating
is the single value that best reflects the individual's overall functioning at the time
of examination.  The rating, however, has two components: (1) symptom severity
and (2) social and occupational functioning.  The GAF is within a particular range if
either the symptom severity or the social and occupational level of functioning falls
within that range.  When the individual's symptom severity and functioning level
are discordant, the GAF rating reflects the worse of the two.  Thus, a suicidal
patient who is gainfully employed would have a GAF rating below 20.  A GAF score
of 21-30 represents behavior considerably influenced by delusions or hallucinations
or serious impairment in communication or judgment or inability to function in
almost all areas.  A GAF score of 31-40 represents some impairment in reality
testing or communication or major impairment in several areas,  such as work or
school, family relations, judgment, thinking or mood. Id.  A GAF score of 41-50
indicates serious symptoms or any serious impairment in social, occupational or
school functioning.  Id.  A GAF score of 51 to 60 represents moderate symptoms or
any moderate difficulty in social, occupational, or school functioning. Id. A GAF
score of 61 to 70 represents some mild symptoms or some difficulty in social,
occupational, or school functioning, but generally functioning pretty well with some
meaningful interpersonal relationships. Id.

suicide attempt. Tr. 368-370, 375 and 512.  The day before the suicide attempt Pandolfo's girlfriend told him she was "leaving and that put him on edge[.]" Tr. 368. Pandolfo attempted to kill himself by consuming 40 Klonopin pills over a 6 to 10 hour period.[13] Id.  Pandolfo's stay at the hospital was initially pursuant to an involuntary (302) commitment. Id.  During the course of the hospitalization his girlfriend visited him and he attempted to attack her and he was restrained by a "Code Control Team." Tr. 368-369.  Subsequently  he became more cooperative and at the time of discharge on August 9, 2010, he agreed to see a psychiatrist and continue therapy with Ms. Velez. Id.  The DSM Axis I diagnostic assessment on August 2nd was major depressive disorder with suicide attempt and Pandolfo was given a GAF score of 25 and a highest GAF score of 50 in the last six months. Tr. 377.  A mental status examination performed on August 2nd revealed that Pandolfo was very angry and irritated about being hospitalized but was able to acknowledge that he was a risk to himself. Tr. 377.  At the time of admission, Pandolfo had a

---

[13]Pandolfo apparently was taking 4 to 6 at a time every hour. Tr. 375. Klonopin is classified a benzodiazepine and "is used to treat seizure disorders or panic disorder." Klonopin, Drugs.com, http://www.drugs.com/klonopin.html (Last accessed August 8, 2014). "An overdose of Klonopin can be fatal." Id.

Glasgow Coma Scale of 15.[14] Tr. 389.  Pandolfo opened his eyes spontaneously; he was oriented and conversive; and he was able to obey commands. Id.  Although complaining of some right rib pain, a  physical examination performed on August 4th revealed no musculoskeletal problems. Tr. 397-398.  The discharge summary set forth a diagnosis of major depressive disorder but did not set forth a GAF score. Tr.

---

[14]Glasgow Coma Scale is "a quick, practical standardized system for assessing the degree of consciousness in the critically ill and for predicting the duration and ultimate outcome of coma, primarily in patients with head injuries. The system involves eye opening, verbal response, and motor response, all of which are evaluated independently according to a rank order that indicates the level of consciousness and degree of dysfunction. The degree of consciousness is assessed numerically by the best response. The results may be plotted on a graph to provide a visual representation of the improvement, stability, or deterioration of a patient's level of consciousness, which is crucial to predicting the eventual outcome of coma. The sum of the numeric values for each parameter can also be used as an overall objective measurement, with 15 indicative of no impairment, 3 compatible with brain death, and 7 usually accepted as a state of coma. The test score can also function as an indicator for certain diagnostic tests or treatments, such as the need for a computed tomography scan, intracranial pressure monitoring, and intubation. The scale has a high degree of consistency even when used by staff with varied experience." Mosby's Medical Dictionary,___, 8th edition. 2009.

368.  At discharge he was prescribed the following medications: Cymbalta,[15] Neurontin[16] and Ambien.[17] Id.

On August 10 and 17, 2010, Pandolfo had appointments with his family physician, Dr. Manzella. Tr. 510-511.  On August 10th Pandolfo told Dr. Manzella that on July 31st he drank five beers and that on August 1st he consumed 15 to 20 Klonopin in an attempt to kill himself. Tr. 511.  He further complained of right rib and abdominal pain. Id.  He attributed the right rib pain to "being physically controlled by security guards." Id.   A physical examination revealed some positive tenderness to palpation of the right ribs.  Id.  Otherwise the results of the physical examination were normal, including no tenderness of the spine and full range of motion. Id.  Pandolfo also denied any depression, anxiety, suicidal ideation and memory loss. Id.  At the appointment on August 17th Pandolfo reported that his rib pain was reduced 50% and his abdominal pain 80%. Tr. 510.

---

[15]Cymbalta "is a selective serotonin and norepinephrine reuptake inhibitor antidepressant . . . [It] is used to treat major depressive disorder and general anxiety disorder [and] is also used to treat fibromyalgia (a chronic pain disorder), or chronic muscle or joint pain (such as low back pain and osteoarthritis pain). Cymbalta, Drugs.com, http://www.drugs.com/cymbalta.html (Last accessed August 8, 2014).

[16]Neurontin (generic gabapentin) "is an anti-epileptic medication, also called an anticonvulsant. . . . [It] is used in adults to treat nerve pain caused by herpes virus or shingles (herpes zoster). . . [It] may also be used for purposes not listed in [the] medication guide." Gabapentin, Drugs.com, http://www.drugs.com/gabapentin.html (Last accessed August 8, 2014).

[17] Ambien is used to treat insomnia. Ambien, Drugs.com, http://www.drugs.com/ambien.html (Last accessed August 8, 2014).

On August 23, 2010, Pandolfo underwent an initial physical therapy evaluation by Mellisa Hager, a physical therapist, at West End Physical Therapy, Inc., located in Kresgeville, Pennsylvania. Tr. 529-530.  The evaluation was requested by Dr. Manzella and revealed that Pandolfo had some limitations in the range of motion of his cervical and lumbar spine. Id.  Cervical extension was limited by 50%; cervical side bending to the left by 25%; cervical rotation to the left by 25%; and trunk extension was "approximately 20 degrees with normal being 25%. Tr. 529. Ms. Hager reported on Pandolfo's subjective complaints of pain in the cervical and lumbar spine and set several goals to be met with respect to the physical therapy, including decreased pain and restoration of full active and passive range of motion. Tr. 529-530.  Ms. Hager stated that Pandolfo had a good prognosis. Tr. 530. A review of the record reveals only two physical therapy progress notes from West End Physical Therapy. Tr. 514-515.  On September 24, 2010, Pandolfo reported a decrease in cervical pain but still complained of low back pain which increased with activity. Tr. 515.   Ms. Hager noted that increased activity such as dancing caused Pandolfo to have an increase in low back pain but noted that he had improved flexibility and cervical range of motion. Id.  On October 26, 2010, Ms. Hager reported that Pandolfo's cervical range of motion was stiff and guarded but was improved with decreased pain and increased range of motion. Tr. 514.  She recommended continued physical therapy and gave Pandolfo a "good to fair" prognosis. Id.

16

On September 27, 2010, Pandolfo had an appointment with Ilan S. Levinson, M.D., a psychiatrist located in Stroudsburg, Pennsylvania. Tr. 438-440.  Dr. Levinson performed a mental status examination which revealed that Pandolfo appeared his stated age; he had no psychomotor agitation or retardation; he had good eye contact; he was cooperative and had good self-care; his mood was depressed and anxious; his affect was restricted; his speech was clear and normal in rate, rhythm and tone; his thought process was goal directed; his depressive features were anhedonia,[18] decreased energy and motivation, feeling overwhelmed and being worried; he had no manic symptoms, delusions, obsessive compulsive traits, homicidal or suicidal thoughts, or hallucinations; his insight and judgment were good; his appetite was good; he had no gross cognitive deficits and his sleep was impaired.[19] Tr. 439.  Dr. Levinson's diagnostic assessment was that Pandolfo

---

[18]Anhedonia is defined as the inability to experience pleasure from activities which are usually found enjoyable. See Dorland's Illustrated Medical Dictionary, 91 (32nd Ed. 2012).

[19]As will be addressed in detail in this section, over the next year Dr. Levinson had 10 such appointments with Pandolfo. The results of the mental status examinations were similar except at times the assessment of various items, including Pandolfo's mood, affect, depressive features, judgment,  appetite and sleep would vary.

suffered from major depressive disorder and he gave Pandolfo a GAF score of 40.

Tr. 440.  Pandolfo was prescribed the drugs Cymbalta, Abilify[20] and Lunesta.[21] Id.

On October 7, 2010, George M. Perovich, Ph.D., a board certified clinical and

forensic psychologist, completed a document entitled "Psychiatric/Psychological

Impairment Questionnaire" on behalf of Pandolfo. Tr. 427-434.  Dr. Perovich stated

that he first treated Pandolfo on August 10, 2010, and his most recent examination

of Pandolfo was on October 7, 2010, and that he treated Pandolfo twice per week.[22]

Tr. 427.  Dr. Perovich's diagnostic assessment was that Pandolfo suffered from

chronic posttraumatic stress disorder, major depressive disorder,  primary

insomnia, alcohol abuse and sexual dysfunction and he gave Pandolfo a current

GAF score of 40 and a lowest GAF score of 40 in the past year. Id.  Dr. Perovich

stated that Pandolfo's prognosis was guarded and that he had a poor capacity to

handle stress and that any stress would lead to decompensation and an increase in

suicidal thoughts. Id.  Dr. Perovich identified the following positive clinical findings

which supported his diagnosis: appetite disturbance with weight loss; sleep

disturbance; personality change; mood disturbance; emotional lability; substance

---

[20]Abilify "is used to treat symtoms of psychotic conditions such as schizophrenia and bipolar disorder (manic depression).  It is also used together with other medications to treat major depressive disorder in adults." Abilify, Drugs.com, http://www.drugs.com/abilify.html (Last accessed August 8, 2014).

[21]Lunesta is used to treat insomnia. Lunesta, Drugs.com, http://www.drugs.com/lunesta.html (Last accessed August 8, 2014).

[22]Our review of the record did not reveal Dr. Perovich's treatment notes.

dependence; recurrent panic attacks; anhedonia or pervasive loss of interests; psychomotor agitation or retardation; paranoia or inappropriate suspiciousness; feelings of guilt/worthlessness; difficulty thinking or concentrating; suicidal ideation or attempts; social withdrawal or isolation; blunt, flat or inappropriate affect; illogical thinking or loosening of associations; decreased energy; obsessions or compulsions; intrusive recollections of a traumatic experience; persistent irrational fears; generalized persistent anxiety; hostility and irritability; and pathological dependence or passivity. Tr. 429.  Dr. Perovich found that Pandolfo was markedly limited (defined as effectively precludes the individual from performing the activity in a meaningful manner) with respect to several areas of work-related functioning, including the ability to maintain attention and concentration for extended periods, sustain an ordinary routine without supervision, work in coordination with or proximity to others without being distracted by them, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and set realistic goals or make plans independently. Tr. 431-432.  Dr. Perovich reported that Pandolfo was seriously impaired and  any work stress would cause him to decompensate; his impairments would last at least 12 months; he was not a malingerer; he was incapable of even "low stress;" he would have "good days" and "bad days;" he would likely miss work more than three times per month as a result of his impairments or treatment; and the earliest date that the description of symptoms and limitations applied was 1999. Tr. 433-434.

19

On October 11, 2010, Pandolfo had a medication review and psychotherapy session with Dr. Levinson. Tr. 437.  A mental status examination performed by Dr. Levinson revealed that Pandolfo appeared his stated age; he had no psychomotor agitation or retardation; he had good eye contact; his self-care appeared good; his mood was anxious; his affect restricted; his thought process was goal directed; he had no depressive features, manic symptoms, delusions, obsessive compulsive behaviors, or hallucinations; his insight was stated to be partial; his judgment was good; his appetite was good; his sleep impaired; he had no cognitive impairments; and he reported no medication side effects. Id.  Dr. Levinson's diagnostic assessment was that Pandolfo suffered from major depressive disorder and he prescribed the medications Cymbalta, Abilify and Lunesta. Id.

On October 19, 2010, Pandolfo had an appointment with Dr. Manzella at which he complained of low back pain at a level of 7 on a scale of 1 to 10. Tr. 508-509. Pandolfo reported no relief as a result of the physical therapy sessions. Id.  The results of a physical examination were essentially normal other than some muscular spasm in the lumbar spine, a flexion deformity of the spine,[23] tenderness to palpation of the lumbar spine and slight decreased grip in the right hand. Id.  Dr. Manzella prescribed the muscle relaxant Flexeril and the narcotic-like pain medication Ultram and ordered an MRI of the lumbar spine. Tr. 509.  The MRI was performed on October 28, 2010, and revealed (1) multilevel degenerative

---

[23]A flexion deformity is the inability to fully straighten a joint.  In this case fully straighten the spine.

spondylosis[24] and annular bulges, (2) a small right foraminal disc protrusion at the

L3-L4 level, and (3) mild bilateral foraminal stenosis and central annular tear at the

L4-L5 level.[25] Tr. 522.

At a follow-up appointment with Dr. Manzella on November 2, 2010, it was

noted that Pandolfo's low back pain was getting worse and at times the pain

radiated into his right thigh. Tr. 504. A physical examination revealed muscular

spasms and tenderness to palpation in the lumbar spine, a flexion deformity, and a

---

[24]Degeneration of the vertebrae and intervertebral discs is medically referred to as spondylosis. Spondylosis can be noted on x-ray tests or MRI scanning of the spine as a narrowing of the normal "disc space" between the adjacent vertebrae. The term is frequently used to describe osteoarthritis of the spine.

[25]The intervertebral discs (made of cartilage) are the cushions (shock absorbers) between the bony vertebral bodies that make up the spinal column. Each disc is made of a tough outer layer (annulus fibrosus) and an inner core composed of a gelatin-like substance (nucleus pulposus).

Degenerative disc disease is the wear and tear and breakdown of the intervertebral discs as a person grows older.  It is a process that can result from the dehydration of the discs as well as an injury to the spine. The breakdown of the intervertebral discs can result in discs bulging, protruding or herniating as well as the inner gelatin-like core of the disc extruding outside the outer layer. These conditions sometimes obstruct the openings (foramen) along the spine through which nerve roots exit. This condition is known as neural foraminal narrowing or stenosis. They can also result in a narrowing of the spinal canal or spinal stenosis. Such bulges, protrusions and herniations if they contact nerve tissue can cause pain. Dehydration of the disc can result in a decrease in the height of the discs.

Degenerative joint disease (or osteoarthritis) is a breakdown of the cartilage between joints.  In the spine there are facet joints which are in the back of the spine and act like hinges. There are two superior (top) and two inferior (bottom) portions to each facet joint called the superior and inferior articular processes. These joints are covered with cartilage and the wear and tear of these joint is known as facet arthropathy (arthritis). This wear and tear of the facet joints result in loss of cartilage and can cause pain.

positive Trendelenburg sign bilaterally.[26] Id.  Dr. Manzella prescribed medications and physical therapy. Tr. 505.

On November 9, 2010, Pandolfo informed Dr. Manzella that the Flexeril provided no relief for his low back pain. Tr. 502-503.  His pain continued at a 5 or 6 on a scale of 1 to 10 and was worse with standing or sitting. Id.  Pandolfo had spasms and tenderness in the lumbosacral spine on the left. Id.   Dr. Manzella scheduled Pandolfo for facet joint injections at the L3-S1 levels of the lumbosacral spine and prescribed the narcotic pain medication Vicodin. Id.

On November 10, 2010, Pandolfo had a medication review and psychotherapy session with Dr. Levinson. Tr. 436.  A mental status examination performed by Dr. Levinson revealed that Pandolfo appeared his stated age; he had no psychomotor agitation or retardation; he was polite and had good eye contact; his self-care appeared good; his mood was depressed and anxious;  his thought process was goal directed; a depressive feature noted was worthlessness; he had no manic symptoms, delusions, obsessive compulsive behaviors, homicidal or suicidal thoughts or hallucinations; his insight was stated to be good to partial; his judgment was good; his appetite was good; his sleep impaired; he had no cognitive impairments; and he reported medication side effects of constipation and dry mouth which were

---

[26]The Trendelenburg test or sign is used to assess hip stability. A positive results suggest weak hip muscles. It can also suggest arthritis. See Trendelenburg's Sign and Hip Abductor Exercises, Livestrong.com, http://www.livestrong.com/article/425133-trendelenburgs -sign-and-hip-abductor-exercises/ (Last accessed August 8, 2014).

tolerable. Id. Dr. Levinson's diagnostic assessment was that Pandolfo suffered from major depressive disorder and he prescribed the medications Cymbalta, Abilify and Lunesta. Id.

At an appointment on November 23, 2010, Pandolfo advised Dr. Manzella that Vicodin was not helping.  Tr. 501.  His right-sided low back pain was rated as an 8 on a scale of 1 to 10 and constant. Id.  Pandolfo had tenderness on the right at the L4-L5 and L5-S1 levels.  Id.  The narcotic pain medication Percocet was prescribed. Id.

On November 29, 2010, Dr. Perovich completed a second assessment of Pandolfo's mental functional capacity. Tr. 442-448.  The assessment was set forth on a questionnaire submitted to him by Bureau of Disability Determination and his answers were very similar to the ones he gave on October 7, 2010.  However, this time he found that Pandolfo had several extreme limitations (defined as having no useful ability to function) in his work-related mental functional abilities. Tr. 447. Specifically, Dr. Perovich opined that Pandolfo was extremely limited in his ability to interact appropriately with co-workers and respond appropriately to work pressures in a usual work setting and to changes in a routine work setting. Id.

On November 30, 2010, Pandolfo had an appointment with Dr. Manzella at which Pandolfo reported that his low back pain was a 6 on a scale of 1 to 10, and his activity level was low and he did not engage in prolonged standing or sitting. Tr. 497.  Dr. Manzella administered lumbosacral facet joint injections on the right side at the L3 through S1 levels . Id.

23

On December 8, 2010, Pandolfo had a medication review and psychotherapy session with Dr. Levinson. Tr. 436.  A mental status examination performed by Dr. Levinson revealed that Pandolfo appeared his stated age; he had no psychomotor agitation or retardation; he was cooperative, polite and had good eye contact;  his self-care appeared good; his mood was euthymic[27] and affect appropriate; his speech was clear with a normal rate, rhythm and tone;  his thought process was goal directed; he had no depressive features such as hopelessness and anhedonia; he had no manic symptoms, delusions, obsessive compulsive behaviors, homicidal or suicidal thoughts or hallucinations; his insight, judgment, sleep and appetite were all stated to be good; and he had no cognitive impairments or medication side effects. Id.  Dr. Levinson's diagnostic assessment was that Pandolfo suffered from major depressive disorder and he prescribed the medications Cymbalta, Abilify and Lunesta. Id.

On December 17, 2010, Pandolfo had an appointment with Dr. Manzella at which Pandolfo reported that the facet joint injections helped his right-sided low back pain but he now had left-sided pain. Tr. 495.  A physical examination revealed muscle spasm, a flexion deformity and tenderness to palpation at the L4-L5 and L5-S1 levels of the spine on the left. Id.    On December 28, 2010, Dr. Manzella administered facet joint injections on the left side. Tr. 494.

---

[27]Euthymic is defined as "pertaining to a normal mood in which the range of emotions is neither depressed nor highly elevated." Mosby's Medical Dictionary, 8th edition, 2009. http://medical-dictionary.thefreedictionary.com/euthymic (Last accessed August 8, 2014).

On or about December 27, 2010, Paul Taren, Ph.D., a psychologist, reviewed Pandolfo's medical records on behalf of the Bureau of Disability Determination and concluded that Pandolfo suffered from a severe anxiety-related disorder and a severe affective disorder but that those disorders did not meet the criteria of any listed impairment.[28]  Tr. 83.  Dr. Taren further concluded that Pandolfo was only moderately limited with respect to three mental functional abilities:  the ability to (1) carry out detailed instructions, (2)  maintain attention and concentration for extended periods, and (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 86-87.  Dr. Taren opined that Pandolfo has the mental capacity to "understand, retain and carry out simple instructions," "make simple work-related decisions" and "abide by a routine without special supervision." Tr. 87.

On January 4, 11 and 21, 2011,  Pandolfo had appointments with Dr. Manzella regarding his low back pain. Tr. 491-493 and 513.  On January 4th Dr. Manzella again observed spasms, tenderness and a flexion deformity in Pandolfo's spine. Tr. 492. On January 11th Dr. Manzella administered a lumbar facet joint injection. Tr. 513. On January 21st Pandolfo reported that he had a 50 to 80 percent reduction in his pain symptoms. Tr. 491.  A physical examination revealed some tenderness in

---

[28]Anxiety-related disorders include panic disorder and posttraumatic stress disorder. Affective disorders include depression and bipolar disorder. Dr. Taren did not examine Pandolfo.

25

the lumbar spine but no spasms and Pandolfo had full range of motion. Id.

Furthermore, it was reported that Pandolfo had mild depression but no anxiety,

suicidal ideations or memory loss. Id.

On January 25, 2011, Pandolfo was examined by Joyce Vrabec, D.O., on

behalf of the Bureau of Disability Determination. Tr. 455-460.  The results of a

physical examination were completely normal other than Pandolfo had "some slight

straightening of the lumbar curve" and "mild reproducible tenderness in the

lumbosacral area bilaterally." Tr. 456.  Dr. Vrabec reported that Pandolfo's ability to

ambulate was "completely normal," he had "full range of motion of his back," and

he had "full range of motion of his upper and lower extremities." Tr. 456-457.

Pandolfo also had normal muscle strength, no muscle atrophy, normal reflexes and

negative straight leg raising tests in the seated and supine positions.[29] Id.  Pandolfo

exhibited "no overt signs of anxiety or depression." Tr. 457.  Dr. Vrabec's

assessment was in toto as follows:

> 1.    Subjective history of chronic lower back pain, I would refer to the
> patient's records as to compliance with physical therapy and
> treatments.  My examination does not show any severe evidence of
> lumbosacral disk disease at this time.

---

[29]The straight leg raise test is done to determine whether a patient with low
back pain has an underlying herniated disc.  The patient, either lying or sitting with
the knee straight, has his or her leg lifted.  The test is positive if pain is produced
between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated
Discs: Straight Leg Raise, SpineUniverse,
http://www.spineuniverse.com/experts/testing-herniated-discs-straight-leg-raise
 (Last accessed August 8, 2014).

2.      A very significant history of psychiatric issues.  Certainly, I would refer
        to the patient's psychiatric evaluation regarding the nature of this
        problem.

Id.  In addition to preparing an examination report, Dr. Vrabec completed a

questionnaire regarding Pandolfo's ability to perform work-related physical

activities. Tr. 459-460.  Dr. Vrabec found that Pandolfo had no limitations with

respect to lifting, carrying, standing, walking, sitting, pushing and pulling. Tr. 459.

She further found that he had no manipulative limitations such as reaching,

handling, fingering and feeling and no environmental limitations such a the need to

avoid exposure to temperature extremes but that Pandolfo could only occasionally

bend, kneel, stoop, crouch, balance and climb. Tr. 460.

On February 15, 2011, Dr. Manzella administered a facet joint injections at

the L3-S1 levels of the spine on the left side. Tr. 485.   On February 18, 2011,

Pandolfo reported that the injection reduced his low back pain but less than 50%.

Tr. 486.

On March 31,  2011, Pandolfo had a medication review and psychotherapy

session with Dr. Levinson. Tr. 436.  It was noted that Pandolfo was no longer seeing

Dr. Perovich.  Id.  A mental status examination performed by Dr. Levinson revealed

that Pandolfo appeared his stated age; his mood was anxious and affect restricted;

his speech was clear with a normal tone;  his thought process was goal directed; he

had no depressive features such as hopelessness and anhedonia;  he had no manic

symptoms, delusions, obsessive compulsive behaviors, homicidal or suicidal

thoughts or hallucinations; his insight was partial and his judgment good; his sleep

27

was impaired and his appetite good; and he had no cognitive impairments or medication side effects. Id. Dr. Levinson's diagnostic assessment was that Pandolfo suffered from major depressive disorder and he prescribed the medications Cymbalta, Wellbutrin[30] and Lunesta. Id.

On April 28, 2011, Pandolfo had a medication review and psychotherapy session with Dr. Levinson. Tr. 474. It was noted that Pandolfo's girlfriend of 7 years recently left him and he was very depressed and not sleeping well. Id. A mental status examination performed by Dr. Levinson revealed that Pandolfo appeared his stated age; he had no psychomotor agitation or retardation; he was polite, cooperative and exhibited good self-care; his mood was anxious and affect restricted; his speech was clear with a normal rate, rhythm and tone; his thought process was goal directed; his depressive features were anhedonia, overwhelming feelings and being worried; he had no manic symptoms, delusions, obsessive compulsive behaviors, homicidal or suicidal thoughts or hallucinations; his insight was partial and his judgment good; his sleep was impaired and his appetite good; and he had no cognitive impairments or medication side effects. Id. Dr. Levinson's diagnostic assessment was that Pandolfo suffered from major depressive disorder and he prescribed the medications Cymbalta, Wellbutrin and Lunesta. Id.

---

[30]Wellbutrin is a medication used to treat major depressive disorder. Wellbutrin, Drugs.com, http://www.drugs.com/wellbutrin.html (Last accessed August 8, 2014).

Pandolfo started therapy with Doris Newberry, a licensed social worker, on April 28, 2011. Tr. 473.  A mental status examination revealed that Pandolfo's mood was anxious and his affect restricted but he had no hallucinations, or homicidal or suicidal thoughts. Id.  The target symptoms[31] listed by Ms. Newberry were anxiousness, decreased energy and motivation, feeling overwhelmed, and being worried. Id.

On May 6, 2011, Pandolfo had an appointment with Dr. Manzella regarding his low back pain but the record of this appointment does not record any physical examination findings other than vital signs, i.e., blood pressure, pulse and blood oxygen level. Tr. 477-478.  On May 10, 2011, Pandolfo had an appointment with Dr. Manzella regarding depression. Tr. 479.  Pandolfo reported that he felt less depressed and had no suicidal thoughts. Id.

On May 16, 2011, Pandolfo had a therapy session with Ms. Newberry at which he reported that he had a very difficult weekend related to ongoing problems associated with his girlfriend breaking up with him. Tr. 472.  A mental status examination revealed that Pandolfo's mood was depressed and his affect restricted but he had no hallucinations, or homicidal or suicidal thoughts. Id.  The target

---

[31]Target symptoms are "symptoms of an illness that are most likely to respond to a specific treatment, such as a particular pyschopharmacologic drug. Mosby's Medical Dictionary, 8th edition, 2009, http://medical-dictionary.thefreedictionary.com/target+symptoms (Last accessed August 7, 2014).

symptoms listed by Ms. Newberry were anxiousness, decreased energy and motivation, feeling overwhelmed, and being worried. Id.

On or about May 23, 2011, Pandolfo sent to Carbon, Monroe and Pike County MH/MR by email a poem in which he expressed suicidal thoughts. Tr. 333-334. As result of that email MH/MR contacted Pandolfo by phone and he was counseled for 23 minutes. Tr. 333. At the end of that phone call Pandolfo agreed to call back at a specified time and MH/MR advised him that if they did not receive a call from him they would contact the police to perform a welfare check. Tr. 334. On May 24, 2011, Pandolfo had a therapy session for 45 minutes with Ms. Newberry. Tr. 470-471. Pandolfo admitted during that session that he felt suicidal over the preceding weekend because his girlfriend left him and that he wrote the poem and posted it on "two computer sites in hopes of generating feelings of guilt from his ex-girlfriend." Tr. 470. Pandolfo further "denied currently feeling suicidal and was able to contract for safety." Id.

On May 26, 2011, Pandolfo had a medication review and psychotherapy session with Dr. Levinson. Tr. 469. It was noted that Pandolfo spoke to mental health counselors over the weekend because he was feeling hopeless and that he felt better after talking to them. Id. A mental status examination performed by Dr. Levinson revealed that Pandolfo appeared his stated age; he had no psychomotor agitation or retardation; he was polite, cooperative and exhibited good self-care; his mood was anxious and affect restricted; his speech was clear with a normal rate, rhythm and tone; his thought process was goal directed; he had no depressive

30

features;  he had no manic symptoms, delusions, obsessive compulsive behaviors, homicidal or suicidal thoughts or hallucinations; his insight was partial and his judgment good; his sleep and appetite were good; and he had no cognitive impairments or medication side effects. Id.  Dr. Levinson's diagnostic assessment was that Pandolfo suffered from major depressive disorder and he prescribed the medications Cymbalta, Wellbutrin and Lunesta. Id.

On June 13, 2011, Pandolfo had a therapy session for 45 minutes with Ms. Newberry. Tr. 468.  Pandolfo reported that he was feeling better and that his mood was improving. Id.  A mental status examination revealed that Pandolfo's mood was euthymic and his affect appropriate and he had no hallucinations, or homicidal or suicidal thoughts. Id.  The target symptoms listed by Ms. Newberry were hopelessness, worthlessness, anxiousness, decreased energy and motivation, feeling overwhelmed, and being worried. Id.  Ms. Newberry opined that Pandolfo was stable and making slow progress. Id.

On June 29, 2011, Pandolfo had a medication review and psychotherapy session with Dr. Levinson. Tr. 545.  Pandolfo reported that he was depressed, anxious and having discord with his business partner. Id.  A mental status examination performed by Dr. Levinson revealed that  Pandolfo appeared his stated age; he had no psychomotor agitation or retardation; he was polite, cooperative and exhibited good self-care;  his mood was depressed and anxious and affect appropriate; his speech was clear with a normal rate, rhythm and tone;  his thought process was goal directed; his depressive features were anhedonia,

31

impaired concentration, decreased energy and motivation, overwhelming feelings

and being worried;  he had no manic symptoms, delusions, obsessive compulsive

behaviors, homicidal or suicidal thoughts or hallucinations; his insight was partial

and his judgment good; his sleep was impaired and his appetite good; and he had

no cognitive impairments or medication side effects. Id.  Dr. Levinson's diagnostic

assessment was that Pandolfo suffered from major depressive disorder and he

prescribed the medications Cymbalta, Wellbutrin and Celexa.[32] Id.  Pandolfo's

prescription for Lunesta was discontinued. Id.  The dosage of Wellbutrin was

decreased and it was decided that it would be discontinued after one week. Id.

On July 2, 2011, Dr. Perovich sent a letter to Pandolfo's attorney

summarizing his treatment of Pandolfo. Tr. 546-548.  Dr. Perovich stated that he

had treated Pandolfo "on and off over the past five years" but did not specify when

he last examined Pandolfo. Id.  Dr. Perovich stated that his diagnostic assessment

was that Pandolfo suffered from chronic posttraumatic stress disorder; chronic and

recurrent major depressive disorder; and atypical personality disorder with

dependent features. Tr. 547.  Dr. Perovich gave Pandolfo a current GAF score of 40

and a guarded prognosis. Id.  He opined that Pandolfo's current condition would

"certainly exceed 12 months" and that he was psychologically disabled and could

not engage in full-time competitive work Id.

---

[32]"Celexa (citalopram) is an antidepressant in a group of drugs called
selective serotonin reuptake inhibitors (SSRIs)." Celexa, Drugs.com,
http://www.drugs.com/celexa.html (Last accessed December 21, 2011).

On July 13, 2011, Pandolfo had a medication review and psychotherapy session with Dr. Levinson. Tr. 544.  Pandolfo reported that he was feeling much better; he had no suicidal ideations; he restarted ballroom dance classes twice weekly; and  he was dating someone from an online service. Id.  A mental status examination performed by Dr. Levinson revealed that  Pandolfo appeared his stated age; he had no psychomotor agitation or retardation; he was polite, cooperative and exhibited good self-care;  his mood was depressed and anxious and affect appropriate; his speech was clear with a normal rate, rhythm and tone;  his thought process was goal directed; his depressive features were decreased energy and motivation, overwhelming feelings and being worried;  he had no manic symptoms, delusions, obsessive compulsive behaviors, homicidal or suicidal thoughts or hallucinations; his insight was good to partial and his judgment good; his sleep was impaired and his appetite fair; and he had no cognitive impairments or medication side effects. Id.  Dr. Levinson's diagnostic assessment was that Pandolfo suffered from major depressive disorder and he prescribed the medications Cymbalta,   Celexa and Sonata.[33] Id.

At a medication review and psychotherapy session with Dr. Levinson on August 10, 2011, Pandolfo's mood was euthymic and his affect appropriate. Tr. 543. His sleep remained impaired and he was advised to continue taking his medications and attend therapy. Id.

---

[33]Sonata is a sedative used to treat insomnia. Sonata, Drugs.com, http://www.drugs.com/sonata.html (Last accessed August 8, 2014).

In a therapy session with Ms. Newberry on August 29, 2011, Pandolfo presented with his ex-girlfriend to discuss their breakup. Tr. 542.  Pandolfo's mood was irritable and his affect restricted. Id.  Ms. Newberry assisted in identifying problematic behaviors. Id.  Pandolfo appeared stable. Id.

On September 1, 2011, Pandolfo had a medication review and psychotherapy session with Dr. Levinson. Tr. 541.  Pandolfo reported that he might have found a buyer for his business and was feeling overwhelmed and having difficulties coping with the stress related to the business. Id.   A mental status examination revealed that  Pandolfo appeared his stated age; he had no psychomotor agitation or retardation; he was polite, cooperative and exhibited good self-care;  his mood was depressed and anxious and affect restricted; his speech was clear with a normal rhythm and tone;  his thought process was goal directed; his depressive features were anhedonia, impaired concentration, overwhelming feelings and being worried; he had no manic symptoms, delusions, obsessive compulsive behaviors, homicidal or suicidal thoughts or hallucinations; his insight was partial and his judgment good; his sleep and  appetite were good; and he had no cognitive impairments or medication side effects. Id.  Dr. Levinson's diagnostic assessment was that Pandolfo suffered from major depressive disorder and he prescribed the medications Cymbalta,  Celexa and Sonata. Id.

In a therapy session with Ms. Newberry on October 17, 2011, Pandolfo reported that he no longer felt welcome at his church and this was yet another blow

to him. Tr. 540.  Pandolfo's mood was depressed and his affect appropriate and he had no hallucinations, suicidal thoughts or homicidal thoughts. Id.

On October 25, 2011, Pandolfo had a medication review and psychotherapy session with Dr. Levinson. Tr. 539.  Pandolfo reported that he was having personal problems and anxiety related to his business. Id.  He requested a prescription for Ativan, noting that it had worked in the past.[34] Id.  Because he was a recovering alcoholic, he was warned about its risks and it was prescribed with no refills. Id. His other medications were continued. Id.  A mental status examination revealed that Pandolfo appeared his stated age; he had no psychomotor agitation or retardation; he was polite, cooperative and exhibited good self-care;  his mood was euthymic and affect appropriate; his speech was clear with a normal rate, rhythm and tone;  his thought process was goal directed; the only depressive feature reported was  being worried;  he had no manic symptoms, delusions, obsessive compulsive behaviors, homicidal or suicidal thoughts or hallucinations; his insight was good to partial and his judgment good; his sleep and  appetite were good; and he had no cognitive impairments or medication side effects. Id.  Dr. Levinson's diagnostic assessment was that Pandolfo suffered from major depressive disorder and he prescribed the medications Cymbalta,  Celexa, Sonata as well as the Ativan. Id.

---

[34]Ativan "is in a group of drugs called benzodiazepines[]. . . [It] is used to treat anxiety disorders. . . [It] can increase the effects of alcohol [and] may be habit forming[.]" Ativan, Drugs.com, http://www.drugs.com/ativan.html (Last accessed August 8, 2014).

At a medication review and psychotherapy session on November 21, 2011, Pandolfo's mood was anxious and his affect restricted but he reported that he had decided to give his business another shot and was happy with the decision. Tr. 538. The diagnostic assessment remained the same and he was continued on the medications Cymbalta, Celexa and Sonata. Id.  On December 21, 2011, his mood was anxious and affect appropriate. Tr. 537. His sleep remained impaired. Id.  He was to continue therapy and medications. Id.

Pandolfo had appointments with Dr. Manzella on November 22 and December 13, 2011. Tr. 549-551.  At the appointment on November 22nd Pandolfo complained of varicose veins, low back pain for several months with increased activity and a lump in his groin on the right side. Tr. 551.  Dr. Manzella referred Pandolfo to specialists and scheduled a facet joint injection. Id.  It appears that Dr. Manzella suspected a right lower extremity varicose vein and a right inguinal hernia. Id.  On December 13th Pandolfo was complaining of right knee pain and Dr. Manzella referred him to an orthopedist, Robert B. Grob, D.O. Tr. 549.  Pandolfo was seen by Dr. Grob on December 19, 2011, and x-rays taken on that day revealed medial side arthritis of the right knee with joint space narrowing and some sclerosis along the tibial plateau. Tr. 563-564.  Pandolfo was diagnosed with a right medial meniscus tear and surgery was tentatively scheduled for January 3, 2012.  Tr. 563. No further records regarding the meniscus tear were presented to the administrative law judge.

After the administrative hearing, the ALJ requested that Pandolfo undergo a psychological evaluation. Tr. 569-574.  That evaluation was performed by Sara J. Cornell, Psy.D., a licensed psychologist on March 14, 2012. Id.  After conducting a clinical interview and mental status examination, Dr. Cornell concluded that Pandolfo suffered from cognitive disorder, not otherwise specified; bipolar disorder, most recent episode mixed, severe without psychotic features; panic disorder without agoraphobia; and alcohol abuse by history. Tr. 574.  Dr. Cornell gave Pandolfo a current GAF score of 40. Id.  With respect to the mental status examination, Dr. Cornell reported that Pandolfo had "difficulty providing examples as to the likely outcomes of his behaviors or what he would do in various imaginary situations" and he could not "perform tests of counting and seriation, such as counting backward from 100 by 7s." Tr. 574.  Along with her report of the examination, Dr. Cornell completed a questionnaire regarding Pandolfo's work-related mental functional abilities. Tr. 569-570.  Dr. Cornell found that Pandolfo had marked limitations in his ability to understand and remember detailed instructions, carry out detailed instructions, and respond appropriately to work pressures in a usual work setting and to changes in a routine work setting; and he had an extreme limitation in his ability to make judgments on simple work-related decisions. Tr. 569.

**IV.**   **Discussion**

The administrative law judge at step one of the sequential evaluation process found that Pandolfo had not engaged in substantial gainful work activity since July 31, 2010, the alleged disability onset date. Tr. 24.

At step two of the sequential evaluation process, the administrative law judge found that Pandolfo had the following severe impairments: "degenerative disc disease lumbar spine, degenerative joint disease right knee and status post right knee arthroscopy by report, [posttraumatic stress disorder], major depressive disorder, bipolar disorder, panic disorder, and history of alcohol abuse in early remission." Tr. 25.

At step three of the sequential evaluation process the administrative law judge found that Pandolfo did not have an impairment or combination of impairments that met or equaled the requirements of a listed impairment. Tr. 26-28.

At step four of the sequential evaluation process, the administrative law judge found that Pandolfo could not perform his past relevant skilled, medium to very heavy work as a hotel manager, home repairer, and maintenance foreman but that he had the ability to perform a limited range of unskilled work at "all exertional levels."[35]  Tr. 28 and 38.  Specifically, the administrative law judge found that Pandolfo could engage in such work which involved

---

[35]As stated earlier if Pandolfo would have been limited to light work, he most likely would have been entitled to an award of disability benefits.

[n]o physical limitations related to lifting/carrying, sitting, standing[,] walking, could engage in no more than occasional bending, kneeling, stooping, crouching, balancing or climbing stairs, ramps, ladders[,] scaffolds or ropes, but would otherwise not be physically limited; can perform work at a moderate production pace not one under high volume[,] high intensity strict quota system work pace set forth in a stable work environment not subject to any more than occasional changes in the work setting; work that allows for occasional contact with members of the public, and could tolerate the presence of co-workers and interact with a social dynamic with co-workers, however should not perform team type work activities; can perform simple work place judgments on an occasional basis, however could not perform complex decision making or dispute resolution type activities.

Tr. 28.  In setting the residual functional capacity, the administrative law judge stated that Pandolfo's allegations regarding his mental impairments and functional limitations were not credible. Tr. 31.  He also rejected the opinions of Dr. Perovich and Dr. Cornell that Pandolfo was markedly limited in several areas of work-related mental functioning as well as the low GAF scores set by them.  Instead, the administrative law judge relied on the opinion of the state agency psychologist who only performed a review of Pandolfo's medical records as of December 27, 2010, and with respect to Pandolfo's physical abilities the opinion of Dr. Vrabec.[36] Tr. 30 and 35-37.

At step five, based on a residual functional capacity of a limited range of unskilled work at "all exertional levels" as described above and the testimony of a vocational expert, the administrative law judge found that Pandolfo had the ability to perform unskilled work as a small products assembler, machine tender and

---

[36]As stated earlier, Dr. Vrabec found that Pandolfo could only engage in postural activities such as bending, stooping and crouching, on an occasional basis.

packager, and that there were a significant number of such jobs in the state and regional economies. Tr. 39.   Neither the administrative law judge nor the vocational expert identified the exertional level - sedentary, light, medium, heavy and very heavy - of the above-referenced positions.

The administrative record in this case is 669 pages in length, primarily consisting of medical and vocational records and we have thoroughly reviewed that record.  Pandolfo argues that  the administrative law judge erred (1)  when he failed to meet his step-five burden of showing that there was work existing in significant numbers in the national economy that Pandolfo could perform, (2) when he failed to properly evaluate the medical opinions of Dr. Perovich and Dr. Cornell, and (3) when he failed to appropriately evaluate Pandolfo's credibility.   The court finds that Pandolfo's first and third arguments have substantial merit. Consequently, we will remand the case to the Commissioner for further proceedings.[37]

Once the Commissioner determines that a claimant cannot perform his past relevant work, the burden shifts to the Commissioner to show there is work existing in significant numbers in the national economy that a claimant can perform. Boone v. Barnhart, 335 F.3d 203, 205 (3d Cir. 2004).  In this case the Commissioner failed to meet that burden.

---

[37]The court expresses no opinion on the merits of the second argument because the court finds the record to be inadequately developed.  On remand, the Commissioner shall revisit this issue.

The administrative law judge found that Pandolfo could perform "a full range of work at all exertional levels" except that he could only occasionally engage in postural activities such as bending, kneeling, stooping, crouching, balancing and climbing.  Social Security Ruling 83-10 provides that

> [t]he considerable lifting required for the full range of medium work usually requires frequent bending-stooping. (Stooping is a type of bending in which a person bends his or her body downward and forward by bending the spine at the waist.)  Flexibility of the knees as well as the torso is important for this activity.  (Crouching is bending both the legs and spine in order to bend the body downward and forward.)

This is important because had the administrative law judge found that Pandolfo was limited to less than medium work, the GRID regulations would have directed a finding that he was disabled without consideration of his significant mental impairments. See 20 C.F.R. , Part 404, Subpart P, Appendix 2, Rule 202.06. [38]  The limitation to occasional postural activities as well as the several other nonexertional limitations, e.g., simple work place judgments, no complex decision making or

---

[38]Contained within the Social Security regulations are grids or tables which lists Rules 201.01 through 203.31 in the left hand column.  There are grids or tables for sedentary, light and medium work.  The Social Security regulations provide that "where the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled." Rule 200.00.  In the right hand column of the grid or table is set forth the "Decision" as to whether a claimant is "disabled" or "not disabled."   If all of the criteria of particular Rule are met "[t]he existence of jobs in the national economy is reflected in the 'Decisions' shown in the rules, i.e., in promulgating the rules, administrative notice has been taken of the numbers (sic) of unskilled jobs that exist throughout the national economy at the various functional levels. . . Thus, when all factors coincide with the criteria of a rule, the existence of such jobs is established." Rule 200.00(b).

dispute resolution type activities, moderate production pace, stable work environment, only occasional changes in the work setting, only occasional contact with the public, and no team type work activities, and the fact that Pandolfo is of advanced age required  the Commissioner to be very specific as to exertional level of the jobs identified by the vocational expert.

The Commissioner argues that Social Security Rule 83-10 does not preclude Pandolfo from all medium work and points out that there are "relatively few occupations" where occasional engagement of postural activities is the norm. The Commissioner refers to the medium jobs of taxi driver, bus driver, and tank-truck driver noted as examples in Social Security Rule 83-10.  The Commissioner also notes one example of a machine tender position - welding-machine tender (DOT # 819.685-010)[39] - which is an unskilled, medium exertional job and states that position "may be consistent with the VE testimony." Doc. 14, Defendant's Brief, p. 9.  The problem with that line of reasoning is there is no substantial evidence that those positions are consistent with all the nonexertional limitations set forth in the ALJ's residual functional capacity assessment.  Notably, the tax driver and bus driver positions mentioned above would require more than occasional contact with the public and there is no way to determine whether or not the welder-machine tender and the tank-

---

[39]"DOT" is an abbreviation for Dictionary of Occupational Titles.  "The Social Security Administration has taken administrative notice of the reliability of the job information contained in the Dictionary of Occupational Titles . . . and often relies upon it . . . ." Burns v. Barnhart, 312 F.3d 113, 126 (3d Cir. 2002).

truck driver positions are consistent with all of the other non-exertional limitations

specified in the ALJ's residual functional capacity assessment.

The administrative law judge in evaluating Pandolfo's credibility did not

consider his lengthy work history.  As noted earlier in this order, Pandolfo had a 44-

year work history.  "When a claimant has worked for a long period of time, [his]

testimony about [his] work capabilities should be accorded substantial credibility."

Rieder v. Apfel, 115 F.Supp.2d 496, 505 (M.D.Pa. 2000)(Munley, J.)(citing

Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979)).  The administrative law

judge did not give an adequate reason for discrediting Pandolfo's testimony.

Our review of the administrative record reveals that the decision of the

Commissioner is not supported by substantial evidence.  We will, therefore, pursuant

to 42 U.S.C. § 405(g) vacate the decision of the Commissioner and remand the case to

the Commissioner for further proceedings.

An appropriate order will be entered.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania


Dated:      August 15, 2014